Cardozo, J.
 

 The plaintiffs are the owners of the Howard farm in the city of Buffalo. They complain that through the action of the city in changing the grade of a street and through the action of the railroad companies in building embankments and bridges, their farm has been flooded. They ask for an injunction and dam
 
 *244
 
 ages, and the courts below, two justices dissenting at the Appellate Division, have sustained their right to that relief.
 

 The case has two branches, which are for the most part distinct. The first branch, and that the most important one, brings up the question whether there has been an unlawful obstruction of the waters of the Buffalo river and of Oazenovia creek. The second brings up the question whether there has been an unlawful obstruction of Howard creek, a rivulet which traverses the plaintiff’s farm. The two aspects of the controversy call for separate consideration.
 

 The Buffalo river is about fifty-six miles long. It runs westerly through the city of Buffalo in an irregular, winding course, and empties into Lake Erie. About six and a half miles from its mouth it is joined by the waters of Oazenovia creek. This is a stream about twenty-six miles long, which runs through the city in a northwesterly direction till it meets the river. In a section of the city south of the Buffalo river, and more than a mile away from it, lies the plaintiffs’ farm. Distant from the river though it is, it has not escaped the floods which for many years have risen above the banks, and inundated the neighboring city. Its owners seek to trace thesf) consequences to acts of the city of Buffalo and of the defendant railroads, which involve, so it is asserted, an unlawful obstruction of the.flood channel of the stream.
 

 As we follow the river in its course upstream, the first railroad bridge which we meet is that of the Lake Shore and Michigan Southern Railway Company. Then comes the bridge of the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad. Next comes the bridge of the Buffalo Creek Railroad, connected by embankments with the lines of the Erie and the Buffalo, Rochester and Pittsburg Railroads; next comes the lower Lackawanna bridge; next the Abbott Road bridge, maintained by the city of Buffalo; and next
 
 *245
 
 the upper Lackawanna bridge. For the moment the Abbott Road bridge will be disregarded, and our attention confined to the bridges constructed by the railroads. They go back in some instances to distant times: the earliest of them was built in 1852, the latest in 1882. As they were first built, culverts and other openings were left in the earth embankments which made up the approaches to them. In the embankment of the Lake Shore and Michigan Southern Railway, the first opening south of the river was distant 5,100 feet from the bridge. In the embankment of the Pennsylvania Railroad and the New York, Chicago and St. Louis Railroad, the first opening south of the river was about 4,000 feet from the bridge. In the embankment of the Buffalo Creek Railway and the Erie Railroad it was about 2,800 feet south of the bridge. In the embankment of the Buffalo, Rochester and Pitts-burg Railroad it was 100 feet north of Tifft street, and Tiff t street is about a mile from the bridge. The approach to the upper bridge of the Delaware, Lackawanna and Western Railroad was on an open trestle about a quarter of a mile long. The approach to the lower Lackawanna bridge does not call for consideration, since no change in respect of that bridge is directed by the judgment. The culverts and trestle work as thus built were maintained for many years. Their abandonment is the occasion of the plaintiffs’ grievance. In 1888 the Lake Shore and Michigan Southern Railroad filled in the culverts in the approach to its bridge so as to create a solid earth embankment; the Pennsylvania Railroad and the New York, Chicago and St. Louis Railroad did the same in 1892; the Buffalo Creek Railroad in 1886; and the Erie Railroad and the Buffalo, Rochester and Pittsburg Railroad in 1890. The Delaware, Lackawanna and Western Railroad in 1891 filled in the trestle work at the east end of its upper bridge and substituted an embankment of solid earth. At the time when this action was begun, in January, 1906, the approaches of earth embankment, without cul
 
 *246
 
 verts or other openings, had been established, and had remained unchanged, for periods ranging from fourteen to nearly twenty years. They were built upon land which belonged to the respective railroads in fee.
 

 There is no claim by the plaintiffs that any part of these embankments extends into the bed of the stream. The channel of the river in its normal course, the channel between its banks on either side, is unobstructed except for the piers of the bridges, which are neither excessive in their dimensions nor otherwise improper in construction. The claim is made, however, that the embankments, though not within the bed of the river, are within its “ flood channel,”
 
 i. e.,
 
 a channel capable, it is said, of accurate definition, within which, at times of freshets, the flood waters of the river were once accustomed to flow, broadening out beyond the normal banks, till finally at some lower point they returned to the river from which they came. It is not needful to pause here in order to, consider whether the boundaries of such a channel can now be traced. It is enough in this connection to state the plaintiffs’ claim in that regard. The obstruction of this flood channel by the embankments leading to the bridges is said to have set back the waters which once had an outlet, it is insisted, through culverts and trestles. The floods thus set back have swollen, it is said,' the waters of the river, which escaping over the Abbott road, in the vicinity of Hopkins street, have poured in great volume over the southerly section of Buffalo till they have reached the plaintiffs’ farm a mile away.
 

 To bring about this result, however*, something more was necessary, even if we accept the plaintiffs’ view, than the change by the railroads in the approaches to their bridges. The other thing that was necessary was a change in Abbott road, for which the city of Buffalo and no other defendant is responsible. The nature of that change is next to be considered. More than forty years ago a turnpike company, known as the Abbott’s Corners'
 
 *247
 
 Plank Road Company, built the Abbott Road bridge across the Buffalo river and the highway connecting with that bridge, which is known as the Abbott road. The course of this road is approximately the same as that of Cazenovia creek until the creek enters the river. Prom there the road runs southwest of the river and several hundred feet away from the river’s banks, till it crosses from the south to the north side of the stream by means of the Abbott bridge at a point between the upper and lower Lackawanna bridges. The Abbott bridge rests to-day upon the same abutments that have been used as a foundation since it was built. The superstructure only has been changed, and of that no complaint is made. The Abbott road, however, as distinguished from the bridge, has been rebuilt and regraded, and, according to the plaintiffs’ contention, with most harmful consequences. When this road was first built by the turnpike company, its roadbed was made higher than the natural surface of the adjacent land. The elevation was altogether artificial. It was made by digging ditches on each side of the road and sluices underneath. The earth from the ditches and sluices was thrown on the road so as to form an elevated driveway. Its height was not uniform. The form of construction thus adopted was useful in promoting the drainage of the road itself, and also, it seems, in interposing an artificial barrier to the flood waters of the river. About 1890 the city of Buffalo acquired all the rights of the turnpike company in Abbott road. Thereafter and in 1892 it closed the ditches and sluices and lowered the grade of the road to the level of the adjacent land. This was done under an agreement between the grade crossing commissioners of the city of Buffalo and the Delaware, Lackawanna and Western Railroad Company with a view to the abolition of the railroad’s grade-crossing at that point. The crossing-now passes above the highway. The turnpike road was so uneven in height that the new grade, though lower
 
 *248
 
 than the old one at some points, is higher at others. The finding is that since the lowering of the grade of Abbott road by the city of Buffalo, and since and including the year 1893, the flood waters of the Buffalo river and Oazenovia creek have flowed across Abbott road in the vicinity of Hopkins street, and it is through this avenue of escape-that they have reached the plaintiffs’ land. Up to that time the plaintiffs were not troubled with floods from that source. The changes in the embankments making up the approaches to the railroad bridges had been made before 1893 and had worked no mischief. The trouble began, so the court has found, when the city of Buffalo changed the grade of Abbott road; and Abbott road, as previously elevated above the adjacent land, was an artificial and not a natural barrier.
 

 These are the changes wrought by the railroad companies and the city of Buffalo which are said by the plaintiffs to have impeded the free flow of these waters within the channels marked by nature. But the changes for which the defendants are responsible are not the only changes that have altered the aspect of this river. Its whole aspect has been transformed through the acts of many other persons, not parties to this action. That transformation must be described before we can justly determine the merits of the plaintiffs’ grievance against the defendants now before us.
 

 The persistent recurrence of floods in the Buffalo river in the autumn and the spring has prompted riparian proprietors to protect their lands from inundation, and this impulse has strengthened with the expansion of the city’s life. What individual initiative has done at many points, has been supplemented by public aid. In 1891 a statute was enacted (L. 1891, ch. 105, sections 404, 405) which declared the bridges then existing over the Buffalo river to be lawful structures, and which authorized the city to dredge, deepen and widen the river and clear it from obstruction. Under the authority of this statute the city
 
 *249
 
 deepened and widened the river from its mouth to the south line of lot 68, Indian Reservation, a distance of about two and a half miles. The improved course is farther down the stream than the section covered by the defendants’ bridges. As a result of this improvement the lower two and a half miles of the river for some years before the commencement of this action were free from floods. Above that point the property owners, while awaiting protection by the city, have endeavored to protect themselves. On the northerly and easterly bank they have built dykes and embankments, which have shut off the flood waters on that side. Thus safeguarded, they have built factories and dwellings, abutting on public streets, in the district which was once inundated. The findings enumerate a long list of industrial plants and other improvements covering this bank of the stream in the same section crossed by the defendants’ bridges. The result has been, as the findings also show, that the flood waters, which in olden times passed over the north and east bank, have been held back, and are now forced to find their outlet either through the normal channel of the river or through outlets on its south and west bank. The volume of water pressing toward that bank in flood seasons to-day is, therefore, swollen, not only by the water set back by the defendants’ bridges, but also by the waters which the building of the city on the north and east has confined within new bounds. If the open trestle leading to the upper Lackawanna bridge were to be restored, some of the great plants now in operation at that point would be flooded and damaged. What has happened on the north and east bank has also happened on the south and west, the bank from which the overflow towards the plaintiffs’ farm descends. On this side, also, factories have been built, land has been filled, dykes have been erected. Almost at the very point on the southerly bank where one of the Lackawanna bridges crosses the river, a great steel plant has been constructed with a solid embankment, which would hold back the waters if
 
 *250
 
 the approach to the bridge were to be removed. These improvements on the banks of the stream have gone hand in hand with a general development of the district south of the river, commonly known as South Buffalo. Within the past seventeen years, streets in large numbers have been laid out in that section, they have been paved and sewered, and houses have been built in conformity with the grades thereby established. On both sides of the river, land once subject to the floods is now part of a city, in fact as well as in name, with factories, shops, homes, streets and all else that city life implies. To restore the conditions of olden times and to let loose the floods again over this great area is, of course, unthinkable. If some parts of the city are still subject to the spread of the waters, the remedy must be found, not in undoing what has been done to protect other parts, but in so altering the bed of the river as to make floods impossible anywhere upon its course.
 

 The state, becoming alive to this need, has come to the relief of the city and its inhabitants with appropriate legislation. By chapter 521 of the Laws of 1906, “The periodical overflow of the Buffalo river and Oazenovia creek within the city of Buffalo,, and the flooding of lands bordering on and adjacent to the same, are hereby declared to be a public nuisance, and said city of Buffalo is hereby authorized to abate the said nuisance, and for that purpose is hereby authorized to widen, straighten, enlarge, clear from obstructions, dredge, deepen, embank and dyke the Buffalo river and Oazenovia creek, and to alter the courses of said river and creek, and to construct new channels for the same, and is also authorized to put in navigable condition the Buffalo river within the limits of said city.” (Section 1.) The same statute provides that “Whenever it shall be necessary for any railroad to cross such proposed new or improved channel of the Buffalo river, the corporation owning or operating such railroad shall construct or rebuild and maintain its bridges over said channel
 
 *251
 
 at its own expense. ” (Section 9.) In October, 1906, the common council of the city of Buffalo, under the authority of that statute, adopted a general plan for the improvement of the river and creek. That plan provides for deepening, widening and straightening the river and creek so as to provide channels sufficient in size to carry off the maximum quantity of water without overflow. The court has found that the work provided for in this plan when carried to completion will, abate the floods and prevent the overflow of the river and creek. At the time of the trial the contract for the work had been let, the work had been for two years in progress, and the court found that in about two years more it would be completed. The respondents’ counsel states in his brief that since the judgment was rendered, the railroads and the city have reconstructed or are reconstructing their bridges in conformity with this plan for the deepening of the channel. By concession, therefore, whether the judgment shall be affirmed or reversed, the hardships from which the plaintiffs now suffer.must soon end. To the litigants before us, the judgment is, therefore, important chiefly in that it establishes a liability for past damages. As a precedent, however, it has an importance far transcending its immediate consequences. If sustained, it may make the defendants liable to other landowners who have suffered similar losses. It may also establish a rule which, if applied to other cities, will stay the development of urban life. The situation thus admonishes us of the need of caution lest, in protecting the plaintiffs against a vanishing danger, we invite other evils not readily to be foreseen.
 

 The learned trial judge found that “ the waters of said Buffalo river and Oazenovia creek, both alluvial streams in the city of Buffalo, have three channels or stages of importance: (a) Low water channel, (b) Bank-full channel, (c) Flood channel; ” that “the hanks of the aforesaid flood channels of said river and of said Oazenovia creek were and, where they have not been obstructed, are irregu
 
 *252
 
 lar elevations of land substantially parallel with the course of the streams, and form the flood channels thereof, and that in times of ordinary flood said flood channel was sufficient to carry, and did carry the waters of said Buffalo river and Oazenovia creek; ” that “ with quite persistent regularity this river reaches a highly-flooded condition twice each year, generally once in the fall or winter and once in the spring, which floods have annually occurred since the earliest recollection of living witnesses; ” that “ prior to about the year 1888 the flooded area and the bounds of the river in its flooded condition, were generally limited and confined by the clearly defined flood banks, marking with certainty the flood channel; this flood channel varying from 500 feet to 1,500 feet in width along the course of the river, and, excepting extraordinary rain falls, or sudden melting of very deep snow, securely keeping the river flood waters therein;” and that “under conditions then existing, before the acts of the defendants complained of, ordinary floods did not overflow Buffalo river flood banks at Abbott road, in the vicinity of, Hopkins street, and reach plaintiffs’ lands.” The finding also is that the changes by the railroads in their embankments have obstructed the flood channels, and thereby set back the waters of the stream; that the city of Buffalo contributed to that result by closing the ditches and sluices in the Abbott road; and that when Abbott road was regraded the flood bank at that point was thereby lowered; and the waters, pent up until then, were discharged upon the plaintiffs’ land. A mandatory injunction is, therefore, granted commanding the railroads to remove their embankments from the original flood channel of the river, and to provide openings of sufficient capacity to permit 25,000 cubic feet of water, flowing at the rate of 4% feet per second, to flow under the tracks and bridges. The operation of the injunction is, however, suspended a reasonable time to permit the railroads to comply with the requirements of such river improvement plan under
 
 *253
 
 the act of 1906 (L. 1906, ch. 527) as will create under the tracks and bridges a channel of equal capacity. A mandatory injunction is granted against the city of Buffalo commanding it to restore the flood channel of the river across Abbott road to the same condition that existed, before the changes already stated were made at that point. The operation of this injunction also is suspended to give the city a reasonable time in which to put in operation its plan for the improvement of the river. The damages suffered by the plaintiffs in depreciated rental value for the six years preceding the commencement of the action, and for the four years of its pendency, aré fixed at $5,500, and the liability for that amount is distributed among the defendants in varying proportions.
 

 This opinion in its review of the facts may seem, like the floods of which it treats, to have swollen to extravagant size. The excuse must be that the legal problems before us cannot be solved without an understanding of the, peculiar features of topography which characterize this river and its banks. In passing to a consideration of those problems, some settled principles may conveniently be recalled. Wheré a railroad builds a bridge under the authority of law, it is not hable for an obstruction even of the bed of the stream, unless through the exercise of due care the obstruction could have been avoided.
 
 (Bellinger
 
 v.
 
 N. Y. C. R. R. Co.,
 
 23 N. Y. 42;
 
 Moyer
 
 v.
 
 N. Y. C. & H. R. R. R. Co.,
 
 88 N. Y. 351;
 
 Gordon v. E. & K. R. R. Co.,
 
 195 N. Y. 137.) A duty rests upon it, however, to minimize the interference with the flow of the water, so far as it reasonably can; and willful or negligent aggravation of the obstruction is an actionable wrong. The existence of such a duty has statutory confirmation (L. 1850, ch. 140, sec. 28, now embodied in Railroad Law, L. 1913, ch. 284, sec. 21.) The application of this ruléis simple where the structure complained of spans the natural banks of the river. More difficult is the application where the
 
 *254
 
 structure complained of lies beyond the natural banks, on land which the railroad owns in fee. In such a case a railroad’s duty to provide an outlet through its own lands for overflowing waters has been made to depend upon the classification of the waters, either as surface waters on the one hand or flood waters on the other; and this classification in turn is governed by the mode in which the waters spread, whether irregularly and vagrantly or in a defined channel marked by its own banks, parallel or nearly so with the banks of the normal stream. Surface waters may be blocked without resulting liability. It is
 
 damnum absque injuria. (Erwin
 
 v.
 
 Erie R. R. Co.,
 
 98 App. Div. 402; 186 N. Y. 550;
 
 Walker
 
 v.
 
 N. M. & Southern Pac. R. R. Co.,
 
 165 U. S. 593, 602;
 
 Atchison, T. & S. F. R. R. Co.
 
 v.
 
 Hammer,
 
 22 Kan. 763.) Flood waters which have not become surface waters, but which maintain their integrity as a definite though broadened course, may not, according to many well-considered decisions, be obstructed by riparian proprietors to the prejudice of their neighbors.
 
 (O'Connell
 
 v.
 
 East Tenn., V. & C. Ry. Co.,
 
 87 Ga. 246;
 
 Cairo, V. & C. Ry. Co.
 
 v.
 
 Brevoort,
 
 62 Fed. Rep. 129;
 
 Crawford
 
 v.
 
 Rambo,
 
 44 Ohio St. 282;
 
 Eastern Oregon Land Co.
 
 v.
 
 Willow River L. & I. Co.,
 
 201 Fed. Rep. 203, 216;
 
 Lawrrence
 
 v.
 
 Great Northern R. Co.,
 
 4 Eng. Law & Eq. 265;
 
 Attorney-Gen.
 
 v.
 
 Earl of Lonsdale,
 
 L. R. [7 Eq.] 387;
 
 Menzies
 
 v.
 
 Earl of Breadalbane,
 
 3 Bligh [N. R.], 414, 418;
 
 Chicago, B. & Q. R. R. Co.
 
 v.
 
 Emmert,
 
 53 Neb. 237;
 
 N. Y. C. & St. L. R. R. Co.
 
 v.
 
 Hamlet Hay Co.,
 
 149 Ind. 344.) It would be futile to attempt to review and still more plainly futile to attempt to reconcile the many cases on this subj ect. They are collated in Farnham on Waters and Water Bights (Vol. 3, secs. 879, 906, 907), and in Kinney on Irrigation and Water Bights (Vol. 1, p. 520). The governing principle was felicitously stated by Lumpicin, J., speaking for the Supreme Court of Georgia in
 
 O'Connell
 
 v.
 
 East Tenn., V. & G. Ry. Co. (supra,
 
 p. 247): “It is contended
 
 *255
 
 by defendant’s counsel that the overflow from a river in time of flood or freshet is surface water, against which, by the common law, a man may protect himself without regard to the consequences to his neighbor. * * * This depends upon the configuration of the country and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current, or leaves the stream never to return, and spreads out over the lower ground, it has become surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel
 
 animo revertendi,
 
 presently to return, as by the recession of the waters, it is to be regarded as still a part of the river.” We find the same thought well stated in
 
 Cairo, V. & C. Ry. Co.
 
 v.
 
 Brevoort (supra,
 
 p. 133): “If there is a natural waterway or course, audits existence is necessary to carry off the water cast into the stream by ordinary floods, that way is the flood channel of the stream; and, if it is the flood channel of the stream, the water which .flows there cannot be regarded as surface water.” In our own state, the law in respect of flood channels is still unsettled. We may for the purpose of this appeal assume, though the facts do not require us to determine, that a clearly defined flood channel may not be needlessly obstructed by a railroad’s embankment. Cases superficially in conflict will be harmonized if we separate them into two classes: in the one class, the embankment has cut off the spread of surface waters, which formerly descended in an undefined mass and settled promiscuously over irregular depressions in adjacent lands; in the second class, it has intercepted flood waters which formerly maintained their own channel and their own identity. In the one class, the obstruction is lawful
 
 (Erwin
 
 v.
 
 Erie R. R. Co.,
 
 98 App. Div. 402; affd., 186 N. Y. 550;
 
 Conhocton Stone Road Co.
 
 v.
 
 Buffalo, N. Y. & E. R. R. Co.,
 
 3 Hun, 523;
 
 Egener
 
 v.
 
 N. Y. & Rock away Beach Ry. Co.,
 
 3 App. Div. 157;
 
 Jeffers
 
 v.
 
 Jeffers,
 
 
 *256
 
 107 N. Y. 650;
 
 Barkley
 
 v.
 
 Wilcox,
 
 86 N. Y. 140;
 
 Moyer
 
 v.
 
 N. Y. C. & H. R. R. R. Co., supra; Wagner
 
 v.
 
 L. I. R. R. Co.,
 
 2 Hun, 633; affd., 70 N. Y. 614); in the other, there are decisions which hold it to he unlawful.
 
 (Mundy
 
 v.
 
 N. Y., L. E. & W. R. R. Co.,
 
 75 Hun, 479;
 
 Van Duzer
 
 v.
 
 Elmira, C. & N. R. R. Co.,
 
 75 Hun, 487; affd. on opinion helow, 152 N. Y. 634;
 
 Drake
 
 v.
 
 N. Y., L. & W. R. Co.,
 
 75 Hun, 422; affd., 151 N. Y. 648;
 
 Higgins
 
 v.
 
 N. Y., L. E. & W. R. R. Co.,
 
 78 Hun, 567;
 
 Wilson
 
 v.
 
 Pennsylvania R. R. Co.,
 
 129 App. Div. 821.) It is the continuity of the river’s life, as a river and not as a dispersed body of water, that supplies the touchstone by which to test the right of interference.
 

 The learned trial judge did not-fail to appreciate these distinctions, and he found that beyond the normal banks of the Buffalo river there was a definite flood channel, varying in width from 500 to 1,500 feet, within which the waters flowed in times of flood, and that it was across this flood channel that the railroads wrongfully filled in the embankments which when first built were provided with proper culverts. There seems to be an inconsistency in the findings at this point, for the maximum width of the flood channel is.stated to be 1,500 feet, and yet the opening nearest the river maintained in any of the bridges (other than the Lackawanna’s trestle) was distant about 2,800 feet, or beyond the limits of the channel as thus defined. If that be so, the embankment within those limits was always solid, and not having been changed within twenty years, the right to maintain it has been established by prescription. But we hesitate, with this complicated record before us, to rely altogether on seeming inconsistencies in the findings; and for the moment we shall disregard them. Even, if the culverts were within the zone of 1,500 feet, we think that there was no flood channel which the defendants were bound to maintain. As we read this record, the plaintiffs have failed to define the bounds of the flood channel if it ever existed;
 
 *257
 
 and though its original bounds were defined, they have become so obscured to-day, with the growth of the city along the banks, that rules applicable to streams flowing through rural districts in their natural course can no longer be applied with justice in new and artificial conditions.
 

 The plaintiffs’ witnesses did, it is true, profess a belief that the Buffalo river once had a definite flood bank. They could not, however, define it. They pointed to a small space, a few hundred feet in width, on the north side, where they thought they perceived tokens of an exterior bank beyond and above the present one. At no other point on either side could they indicate the limits of such a channel if it ever existed. They concede, in substance, that all one can, do to-day is to study a contour survey and try to guess as best one may where the waters used to go. They had not studied such a survey and they made no attempt to trace the channel. It may be that study of the contour of the land would prove that the flood waters instead of following a definite course, dispersed themselves irregularly.
 
 (Erwin
 
 v.
 
 Erie R. R. Co., supra.)
 
 A landowner is at least presumptively within his rights in building as he pleases on his own soil, and before that right can be taken away from him by bringing the soil within the limits of some bygone flood channel, the proof of the boundaries of such a channel should be reasonably certain. Were the law to exact less than that, many a river front would be permanently withheld from improvement.
 

 The plaintiffs failed, therefore, to prove the existence of a flood channel at the site of the railroad bridges; they failed also to prove one at the point where the city of Buffalo is said to have diverted the waters of the stream. The finding is that the southerly bank of the flood channel at the point from which the waters overflowed till they reached the Howard farm, was the Abbott road. That road, however, was not a natural barrier. It was an
 
 *258
 
 artificial one, raised by man above the adjacent land. It was distant several hundred feet from the normal banks of the river. The city in regrading it raised the grade at some points and lowered it at others, but nowhere lowered it below the adjacent land, which was nature’s only barrier. The removal of this artificial elevation was not a wrongful act. The city was not bound to maintain the uneven plank road, with irregular elevations, built many years ago by the turnpike company, even though some of the irregularities were useful in barring the spread of waters.
 
 (Prime
 
 v.
 
 City of Yonkers,
 
 192 N. Y. 105;
 
 O'Donnell
 
 v.
 
 City of Syracuse,
 
 184 N. Y. 1;
 
 Anchor Brewing Co.
 
 v.
 
 Vil. of Dobbs Ferry,
 
 84 Hun, 274; affd. on opinion below, 156 N. Y. 695;
 
 Lynch
 
 v.
 
 Mayor, etc., of N. Y.,
 
 76 N. Y. 60.) It had the right to make the grade uniform as long as it did not go below nature’s elevation. As soon as this road was lowered, and not till then, the waters overflowed at Hopkins street and Abbott road, and, overflowing, spread without a definite course. If the city is within its rights in maintaining this road at the lower grade, and persists in so maintaining it, we can find nothing in the record to show that the removal of the railroad embankments would cause the overflow to cease.. The significant thing, however, is the lack of any natural barrier. Plainly at this point there was no flood channel established by nature. It failed here. It may, for all that the evidence shows, have failed at numberless other points along the river’s course.
 

 We cannot say, therefore, where the flood channel of the Buffalo river lay in bygone times, but even if we must assume that such a channel with definite bounds once .existed, certain it is, in any event, that none can be' traced to-day. The banks of the river have been dyked, and a new city, with homes and factories, has been built upon the adjacent lands. The region covered by these buildings is within the flood channel, if there ever was
 
 *259
 
 one, just as much as the land occupied by the defendants is within it. These homes and factories equally with the railroad embankments have dammed the river, and held back its overflowing waters. It may be that while these changes were in progress, they might have been enjoined.
 
 (Lawrence
 
 v.
 
 Great Northern R. Co.,
 
 4 Eng. Law & Eq. 265;
 
 O'Connell
 
 v.
 
 East Tenn., V. & G. Ry. Co., supra; Cairo, V. & C. Ry. Co.
 
 v.
 
 Brevoort, supra; Nield
 
 v.
 
 L. & N. W. Ry. Co.,
 
 L. R. [10 Ex.] 4.) We do not express an opinion on that point, for it is not before us. But the changes are an accomplished fact, and they cannot now be undone. The rules applicable to the obstruction of streams in an unsettled or rural region cannot be rigidly applied where an urban population has planted its factories and homes. The law of water rights is not an inflexible body of precedent. It takes heed of the varying wants of varying localities.
 
 (Barkley
 
 v.
 
 Wilcox,
 
 86 N. Y. 140, 146, 148;
 
 Egener
 
 v.
 
 Rockaway Beach R. Co.,
 
 3 App. Div. 157, 162;
 
 Bowlsby
 
 v.
 
 Speer,
 
 31 N. J. L. 351;
 
 Town of Brookhaven
 
 v.
 
 Smith,
 
 188 N. Y. 74.) No court would presume by mandatory injunction to compel the destruction of a great section of a city because in building it the limits of some ancient flood channel were obstructed. We cannot order these homes and factories to be removed
 
 (Penrhyn Slate Co.
 
 v.
 
 Granville E. L. & P. Co.,
 
 181 N. Y. 80;
 
 N. Y.
 
 v.
 
 Pine,
 
 185 U. S. 93), yet if the defendants’ structures have helped to swell the stream, these also have contributed to that result. To bid the defendants take down their embankments while leaving their neighbors all about them untouched, would be an unjust discrimination. More than that, in the very act of removing the embankments, some of these neighboring buildings, now secure, would be flooded. The burden, if removed from the plaintiffs, would be transferred to others. It is doubtful whether the plaintiffs’ lands would be benefited. It is certain that other districts, long reclaimed, would be imperiled. In these cir
 
 *260
 
 cumstances, it is a vain endeavor to define the defendants’ duties by the rules applicable to this river when nature marked the boundaries of its floods. The complications have become too intricate to he unraveled. One of the plaintiffs’ witnesses, Colonel Symons, an engineer of wide experience, when asked what, other than deepening the channel, could be done to remedy the overflow at Abbott road, said that there was nothing to do except to destroy the improvements along the banks of the river, and that, he conceded, would be an absurdity. An absurdity, of course, it would he, for the decrees of a court of equity are framed in reason and justice. But' from the recognition of the absurdity, a lesson may he drawn. The lesson is that the time has gone by when the consequences of. all these encroachments can be traced and apportioned to their several authors; that the wrongs of others are not to he visited on the defendants; and that rules of law applicable to waterways in a state of nature may no longer with, safety and justice be applied to waterways transformed by the hand of man. Our conclusion is that the interference with a primeval flood channel, brought about by the acts of the defendants, cannot to-day be separated from that resulting from the acts of others. There is one remedy and that a complete one for the plaintiffs’ troubles. It is the artificial deepening and widening of the stream. That work is now in progress under the direction of the public authorities, and will speedily end the floods, if it has not already done so. In the confusion brought about by the interaction of many and subtle forces, all working to obscure the conditions of olden times, the legislature has intervened, and supplied a remedy. We think there is no other.
 

 The obstruction of the Howard creek is still to be considered. The lines of some of the railroads pass the Howard farm on the west, and their tracks built'on solid embankments intercept the Howard creek and throw its waters back in a stagnant mass on the farm. The
 
 *261
 
 defendants deny that the Howard creek is now a living stream. Its waters have doubtless been largely diverted through sewers which have tapped them; but we think. there is evidence to sustain the finding that its identity has not been lost. The railroads formerly provided openings through their embankments for the drainage of this creek. The openings can he restored readily and with slight expense. We think it is the duty of the railroads to restore them.
 

 The judgment should be reverséd and a new trial granted, with costs to abide the event.
 

 Willard Bartlett, Oh. J., Werner, Collin, Ouddeback and Hogan, JJ., concur; Hornblower, J., not sitting.
 

 Judgment reversed, etc.