C. M. BOTT FURNITURE COMPANY, INC., Plaintiff, v. THE CITY OF BUFFALO, Defendant.

Supreme Court, Erie County, March 21, 1928.

Municipal corporations — damage by flood — plaintiff claims factory was damaged through ice jam at bridge crossing creek in city of Buffalo — bridge was constructed and maintained by city — flood was greatest in memory of witnesses in thirty years — negligence cannot be imputed to city in not providing against flood — filling in land along creek to prevent flooding of other property was not cause of damage to plaintiff — natural flood channel not established — land filled in belonged to third party who was not made party defendant in this action.

The city of Buffalo is not liable for damages claimed to have been done to plaintiff's factory by reason of a flood caused by an ice jam at a bridge crossing a creek which had been constructed and was being maintained by the city, where the proof shows that the flood was the greatest within memory of witnesses for a period of more than thirty years and that the unusual climatic conditions of that year were responsible for the flood.

A city is only liable in instances like this where it neglects to construct a bridge of sufficient capacity to meet the ordinary exigencies of the climate and the situation of the stream, and also such extraordinary exigencies as may reasonably be expected to occur.

The filling in of land along the creek to prevent flooding of other property was not the cause of the damage to plaintiff's property though it may have operated to hold back the waters of the creek and confine them to the main channel. The existence of a natural flood channel is not established by the evidence.

Furthermore, the land belonged to a third party who was not made a party defendant in this action.

ACTION to recover for damages alleged to have been caused by flood.

*Paul J. Batt [Percy S. Landsowne of counsel], for the plaintiff.*

*Frederick C. Rapp, Corporation Counsel [Andrew P. Ronan of counsel], for the defendant.*

CHARLES B. WHEELER, Official Referee.   This action is brought to recover damages caused by the flooding of plaintiff's factory by a flood which occurred February 12, 1918, when Scajaquada

creek overflowed its banks and inundated adjacent territory. This creek ran in a westerly direction across the city of Buffalo. At various times this creek has overflowed its banks, but the flood of 1918 was the greatest in its history so far as rests in the memory of living witnesses. For a long distance within the city the land lying on either side of its banks is flat and low.

Many witnesses were called to describe the conditions existing at the time the flood took place, and to sustain the allegations of the complaint. The defense in substance is a general denial. The plaintiff's complaint alleges that the flooding of its property was caused by two things: *First,* by the obstruction of the natural flow of the waters of the creek by the construction and maintenance of a wooden bridge across the creek at or near Norfolk avenue, and *second,* by the dumping of ashes, refuse and waste material along the banks of said creek, particularly on the north side thereof, by which the channel of said creek was narrowed and constricted.

Assuming for the argument that the flooding of the plaintiff's premises was in fact caused by an ice jam at the Norfolk avenue bridge, and the setting back of the waters of the creek so as to overflow the land and buildings of the plaintiff, the question still remains whether the city in the exercise of reasonable care should have anticipated and guarded against such results, or whether what occurred on February 12, 1918, was such an unusual and extraordinary flood that it could not have been reasonably anticipated.

We think it a correct statement of the law that the city is only liable where in cases like this it neglects to construct a bridge of sufficient capacity to meet the ordinary exigencies of the climate and the situation of the stream, and also such extraordinary exigencies as may reasonably be expected to occur. (*Roberts* v. *City of Glens Falls,* 166 App. Div. 464, 465.)

The evidence is that the flood of February 12, 1918, was the greatest in the memory of witnesses who had known the stream upwards of thirty years. The average flow of the water at flood times was at the rate of from 400 to 500 cubic feet per second, while in the flood of 1918 it flowed at the rate of from 1,400 to 2,000 cubic feet per second.

Unusual climatic conditions were responsible. The winter of 1918 was the coldest in the history of the United States Weather Bureau. A great quantity of snow fell and remained unmelted on the ground. Then came warm weather accompanied with rain, melting the accumulation of snow and the water from the territory drained by the creek poured into the creek in immense volume.

40

It broke up the ice which covered the stream, and which owing to the continued cold had frozen to unusual thickness. The ice floated down stream owing to its thickness in large cakes, and in some cases had to be broken to facilitate its passage under bridges.

There were bridges which spanned Scajaquada creek other than the one at Norfolk avenue, and the evidence is that at these other bridges the water piled up against them to an equal, if not greater degree than at the bridge at Norfolk avenue, running over the tops of such bridges in some instances. These facts tend to show further that in the building and maintenance of these other structures the city had theretofore found them adequate for all anticipated floods, and that that at Norfolk avenue formed no exception, and it may be added the overflow was not primarily due to faulty construction of the Norfolk avenue bridge, but to the general flood conditions which prevailed.

The referee is, therefore, forced to the conclusion that the evidence shows that the flood which occurred on February 12, 1918, was so unusual and extraordinary that negligence cannot be imputed to the city in not providing against it.

Over and above the reasons stated above it is very doubtful whether the presence of the bridge over the creek at Norfolk avenue materially contributed to the flooding of the plaintiff's factory. This factory is located to the east of the bridge in question and to the east of the embankment of the Erie Railroad Company. The railroad crosses the creek on a bridge, and water coming down the creek first passes under the Erie railroad bridge before reaching the Norfolk avenue bridge. Accurate measurements were taken of the height of the flood waters on February twelfth, and the evidence is that the water just east of the Erie railroad bridge was some nine inches higher than the water at Norfolk avenue. An engineer in the employ of the city testified that the openings under the Norfolk avenue bridge are nearly three times larger than the cross section of the Erie railroad bridge, and would take care of approximately three times the amount of water flowing under it as the Erie railroad bridge would. It is a logical inference that the higher level of water east of the railroad bridge was in part, if not wholly, occasioned by its arrested flow at the Erie railroad bridge, rather than due to any obstruction at the Norfolk avenue bridge.

In any event the evidence is practically undisputed that nearly the whole territory east of the Erie railroad bridge clear to Genesee street over a mile away was covered with water. Leslie street, on which the plaintiff's factory stood, was deep in water, and this water flowed back of and around houses standing on Norfolk

avenue. These facts are stated for the purpose of showing the wide area inundated by the flood, and also of showing that whatever obstruction to the flow existed at the Norfolk avenue bridge was not primarily responsible for the conditions existing further east, or where the plaintiff's factory stood.

This conclusion is further confirmed by the fact that a very large area of land was flooded west of the Norfolk avenue bridge clear to Fillmore avenue. The bridge over the creek at Hager street, over a mile from Norfolk avenue, was entirely covered by water. The general situation can only be explained by the great volume of water filling and overflowing the banks of the creek. The volume was in truth so great that practically none of the bridges over the stream could entirely take care of the water which came to them.

Under such conditions we think it would be going far to charge the city with responsibility for the damages the plaintiff suffered.

The referee now comes to the consideration of the filling which took place on the land on the north side of the creek and its effect.

The evidence is that the land on both sides of the creek is naturally low, but before any filling took place that south of the creek was slightly lower than that to the north. The time came when streets were opened through the territory south of the creek running to the creek's bank. Many houses were built on these streets, and the level of the land raised by filling and by the earth taken out for cellars, so that at the time of the flood of February, 1918, the general level of the land south of the creek was higher than that on the north.

General Edmund Hayes owned a tract of land on the north bank opposite Norfolk avenue. This land in times of floods was submerged by the overflow of water from the creek. Naturally General Hayes desired the level of his land raised so as to avoid this overflow. Some arrangement was made between him and the city by which the city was permitted to use his land as a dumping ground for ashes and refuse, which the city had to dispose of. Accordingly the land of General Hayes was used for this purpose. As a result the level of the land along the margin of the creek was raised, and the plaintiff contends this resulted in preventing the overflow on the north onto the Hayes land, and confined it to the natural and ordinary channel, and operated to throw the flood waters over onto the land lying on the south side. This the plaintiff contends was an unlawful interference with the stream to the damage of the owners of property on the south side.

An attempt was made on the trial to show that what was done operated to close a natural flood channel which the city had no

right to do.  As the referee understands the evidence, the claim that there existed any natural flood channel is not established. There was no such channel leading off of the creek at any point along the lands of General Hayes.  The evidence on the contrary is that when the creek overflowed its banks in times of flood the water spread out generally over the land, thus submerging it, and that when the flood subsided then most of the water covering the land drained off and re-entered the creek at or near Stevens street, which is some six city blocks to the west of Norfolk street.  At or near Stevens street there may have existed a slight channel or depression through which these waters drained and re-entered the creek.  However, we do not think such a channel can be defined as a natural flood channel as that term is used in the decisions and discussions of the courts.  In our opinion those terms are used to designate a channel beginning at some point on the banks of a stream and ending at some other point lower down the stream through which flood waters naturally flow in times of high water. None of these conditions are shown to have existed in this case. The only channel claimed is a comparatively short one through which accumulated waters spreading over a large territory finally drained away.  In our opinion this cannot be deemed a natural flood channel.  What then is the law governing the situation disclosed by the facts?  We think the case of *Howard* v. *City of Buffalo* (211 N. Y. 241) decisive and controlling.

The general facts in that case are not unlike those in the case in hand.  We think General Hayes was within his rights in filling in his land and raising its level.

In the course of a long and able opinion discussing various phases of the case in *Howard* v. *City of Buffalo*, Judge CARDOZO, among other things, said, touching the question as to what constituted a flood channel that: " It is the continuity of the river's life, as a river and not as a dispersed body of water, that supplies the touchstone by which to test the right of interference," that is, with the right to stop the overflow of a given stream.  Applying this test to the facts in this case we find there was no continuous flow of Scajaquada creek after its waters had spread over the territory lying east of its banks at or near the lands of General Hayes.

The court holds in the *Howard* case that surface waters, such as spread over the Hayes property and contiguous lands, " may be blocked without resulting liability."  (Citing *Erwin* v. *Erie R. R. Co.*, 98 App. Div. 402; 186 N. Y. 550; *Walker* v. *N. M. & Southern Pacific R. R. Co.*, 165 U. S. 593, 602; *Atchinson, T. & S. F. R. R. Co.* v. *Hammer*, 22 Kans. 763.)

Therefore, the referee holds that the filling placed on General

Hayes land to prevent the flooding of his property cannot be made a basis of complaint even though it may have operated to hold back the waters of the creek and confine them to the main channel. A fair question we think might be raised, even though the referee were to hold to the contrary, whether the city in dumping would be liable for damages.

The land belonged to General Hayes. His land was benefited. He permitted the city to dump for his benefit. Is not the filling and raising of levels to be deemed the act of General Hayes for the purposes of this litigation? General Hayes was not made a party defendant to this action.

The referee is of the opinion the plaintiff's complaint should be dismissed, with costs.

So ordered.