(57 App. Div. 239.)

SHANNAHAN v. STATE.

(Supreme Court, Appellate Division, Third Department. January 9, 1901.)

CANALS—INJURIES FROM OVERFLOW—LIABILITY OF STATE.

The act of employés of the state in leaving an important wasteweir of a canal entirely unattended from midnight till morning during an excessive rainstorm, thus permitting the waters of the canal to overflow its banks, constitutes negligence, which renders the state liable for damages caused by the overflow.

Smith, J., dissenting.

Appeal from court of claims.

Claim by Maurice Shannahan against the state of New York. From a judgment for the state dismissing the claim, the claimant appeals. Reversed.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, MERWIN, and SMITH, JJ.

James C. Rogers, for appellant.
John C. Davies, Atty. Gen., for the State.

PARKER, P. J. This is an appeal from a decision of the court of claims awarding judgment in favor of the state and dismissing the

claimant's claim. The claim made is for damages caused by the waters of Champlain Canal overflowing its banks at what is known as the "Twelve-Mile Level," and injuring the claimant's crops. It is brought under the provisions of section 37, c. 338, Laws 1894, and, as appears from the claim filed, is based upon the negligence of the parties in charge of such canal. From a careful reading of the record before us, certain facts seem to be clearly established. The bank of the canal, upon which the towpath was constructed, was adjacent to the claimant's lands, and at this part had for some years been worn down so that its top was but two or three inches above the ordinary level of the water therein. Some years before the state had raised other parts of the bank along that level, but the bank in the neighborhood of claimant's lands had been left in that condition. During the night of the 13th and 14th of July, 1897, a severe rainstorm occurred, and water from the canal, along this level, at several places overflowed its banks. Some of such overflow was discharged onto the claimant's lands, and thoroughly drenched and soaked his crops growing thereon; so much so that the water stood on the land for several days thereafter. On the day before this flooding such crops were in good condition. It cannot be doubted but that the crops, to some extent, were injured by this flooding. What the crops would have produced after the storm, had there been no overflow, is not so clear. There were two sources of supply of water to this level,—one from a feeder about seven miles long, leading to it from the Hudson river; the other through Bond creek, which flowed from the north, and was taken into the canal at Dunham's Basin. Opposite this point of entry a wasteweir was constructed in the canal, with 10 gates, which could be opened when necessary, and discharge the excess of water into the natural bed of the creek on the further side of the canal, whence it continued on its course to the Hudson. On the night in question there was a very heavy rainfall. It seems to have rained heavily up to about 11 o'clock in the evening, then to have cleared up somewhat, only to begin later, and continue with a heavier fall until morning. The argument on the part of the claimant is that the men in charge of the gates and wasteweirs were so extremely negligent that they did not properly control the incoming waters through the feeder from the Hudson, nor sufficiently allow them to be discharged through the wasteweir at Dunham's Basin, and at other points where they might have been discharged; and that, therefore, they overflowed the banks, and worked the injury complained of. There seems to be no doubt but that, if those in charge had remained constantly at their posts, and regulated the flow of water through the feeder and through the wasteweir constructed to take care of the water from Bond creek and at other places, the volume of water coming into the canal could have been taken care of, and prevented from overflowing its banks. This claim seems to be sustained not only by the testimony of witnesses to that effect, but also by the fact that in 1899 a much larger volume of water, falling in a shorter time, was cared for, and did not cause any overflow; and this circumstance also seems to indicate that the rainfall at the time of the overflow was not such an extraordinary and unusual flood as to exonerate the state from liability for not protect-

ing against it. There is a conflict of evidence as to whether the gates at the head of the feeder were shut at all during that night; so much so that, if that were the only negligence complained of, we would not feel justified in interfering with the view which the court below may have taken concerning it. But the clear preponderance of evidence seems to be that the man in charge of the wasteweir at Dunham's Basin was so utterly indifferent to the situation that we cannot see how he can be exonerated from negligence that in all probability occasioned the overflow. It is evident that such a rain as occurred on the night in question would raise a stream like Bond's creek very rapidly; much more so, probably, than it would the Hudson. Such a stream, particularly if the storm should continue, would be sure to rise, and in a few hours pour a rapid volume of water into the canal. Such a stream could not be safely left without watching, and it might well be expected to show its worst after 11 o'clock that night. It is conceded that the man whose duty it was to watch it went home to bed at about that hour, and slept through the heaviest part of the storm until morning. Also it appears that another employé, having general charge of that level, was at that wasteweir at about 2:30 or 3 o'clock that night, and did not open its gates any wider, nor call the one having it in charge. It is true, he testifies he did not think it necessary, but he did testify that it was then raining as hard as he ever saw it rain; and we are clearly of the opinion that under such circumstances that point should not have been left without a watchman. Nor, as suggested above, does the evidence sustain a claim that the rainfall in question was so extraordinary that it should not have been anticipated and guarded against. Cottrell v. Infirmary, 70 Hun, 495, 24 N. Y. Supp. 381; Mundy v. Railroad Co., 75 Hun, 479, 27 N. Y. Supp. 469. A full discussion of this evidence in all its detail is not appropriate nor necessary. It is sufficient to say that, in our judgment, upon the evidence before us, it should be held that the state negligently permitted the overflow which occurred upon that night. Whether the court below reached a different conclusion, we are unable to tell from the record before us. There are no findings, either of fact or of law; no opinion; nothing but the naked judgment dismissing the claim. We could reach a conclusion much more satisfactory to ourselves if we could know whether the decision below was based upon a proposition of law, or because the evidence failed to convince the court that the facts charged against the state were true. But we must take the evidence as it appears to us, and render such a decision thereon as the law requires. If the overflow which spread onto the claimant's land, and to some extent, at least, injured his crops, occurred because of the negligent omission of the state,—as we think it did,—we see no reason why, as matter of law, judgment should not have gone against the state under the statute above cited. Sipple v. State, 99 N. Y. 284, 1 N. E. 892, 3 N. E. 657. We conclude, therefore, that the judgment must be reversed, and a new trial granted.

Judgment reversed on the law and facts, and new trial granted, with costs to appellant to abide event. All concur, except SMITH, J., who dissents.