(99 App. Div. 52)

CROWLEY v. STATE.

(Supreme Court, Appellate Division, Third Department.    November 16, 1904.)

1. CANALS—OVERFLOW—DAMAGES—NEGLIGENCE—EVIDENCE.

On a claim against the state to recover damages for injuries to crops submerged by water which overflowed the banks of the Champlain Canal, evidence considered, and *held* to show that the overflow was caused by the canal bank at the point in question being lower than the general level of the bank, and because of the failure of the waste-weir tenders (employés of the state) at certain places to properly attend to their duties.

Appeal from Court of Claims.

Claim by Patrick Crowley against the state. From a judgment of the Court of Claims dismissing the claim, the claimant appeals. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Brodie D. Higley, for appellant.

John Cunneen, Atty. Gen., and Sylvester S. Taylor, Dep. Atty. Gen., for the State.

CHASE, J.    The claimant seeks to recover damages for injuries to potatoes and corn planted on a field which was submerged by water that overflowed the banks of the Champlain Canal. That part of the Champlain Canal between Ft. Edward and Ft. Ann is known as the "Twelve-Mile Level." A short distance east of the canal, along this level, are the railroad tracks of the Delaware & Hudson Company. Between the canal and the railroad tracks is a strip of low land, and the field upon which claimant had planted said potatoes and corn is situated between the canal and the railroad tracks, about 4½ miles south of Ft. Ann. This level of the canal is fed by an artificial channel about 7 miles long, known as the

"Glens Falls Feeder," which takes water from the Hudson river and empties it into the canal south of Bond creek. The water in such feeder is controlled by gates at the place where it is taken from the river. This level is also supplied with water from Bond creek, which is cut off by the canal at Dunham's Basin, about 3½ miles south of claimant's field, by Haskin's brook, which is cut off by the canal at or near claimant's field, and also by other smaller streams. At several points along said level are spillways, built at the normal height of the water in the canal. One of such spillways is built opposite the place where Bond creek enters the canal, and one opposite the place where Haskin's brook enters the canal. There are 266 lineal feet of spillways on said level, which, with 6 inches of water over the spillways, will discharge from the canal 313 cubic feet of water per second, and, with 1 foot of water over the spillways, 885 cubic feet of water per second. Provision is also made for emptying the canal and for the discharge of water therefrom on extraordinary occasions by waste weirs or gates opening from the canal several feet below the normal surface of the water. There are four sets of such gates on the Twelve-Mile Level. One set of ten gates is situated at Dunham's Basin, and each gate, when open, will discharge from the canal 177½ cubic feet of water per second; one at Smith's Basin, about one-half mile north of claimant's field, consisting of four gates; and one, called "Empey Weir," about 2½ miles north of claimant's field, consisting of four gates. Each gate at Empey weir and at Smith's Basin is 3½ feet square, and will discharge from the canal 135½ cubic feet of water per second. The fourth set of gates is at Ft. Edward, where the water is discharged from the Twelve-Mile Level into the level adjoining it on the south, and it consists of four gates. On July 24, 1902, the water in the canal was at its normal height. It commenced raining about 2:30 or 2:45 p. m., and soon thereafter it rained violently, and it continued for about an hour and a half. About 4 o'clock it ceased raining, and at about that time the water commenced running over low places in the bank of the canal opposite claimant's field, and continued until the potatoes and corn on his entire field of 16 acres were covered with water. The rain was a local one, and did not extend to Glens Falls.

The towpath was raised in 1895, and in 1902 it was 18 or 20 inches higher than the spillways. There was a depression, however, in the towpath for several rods at and near claimant's field, so that at that point it was only 10 inches higher than the spillways. During the day and time in question the normal amount of water was being fed into the canal from the Glens Falls feeder. The state employed a waste-weir tender at each of the sets of waste weirs. The man employed at the Smith Basin weir was employed to take care of the gates for the season, and he exercised full care thereof. He did not make reports to any one in charge of the canal. He tested the gates six or seven weeks before July 24th, and found that two of them could not be raised. He did not do anything in regard to it, except that he says, "I think I reported their condition to A. Q. Scott, captain of the State Boat." On July 24th the

patrolmen were not at Smith Basin or Empey weirs until after the rain had ceased. The tender at Dunham's Basin weir raised 1½ gates after it had rained 15 minutes. He continued raising the gates, waiting a few minutes between each, until he had raised seven gates, and then the water in the canal began to decrease. After he had raised four gates he was informed that the water was overflowing the canal bank. The water had raised seven or eight inches in the canal, and was then running toward Dunham Basin from the north. The tender at Ft. Edward weirs noticed the water was rising, and opened the gates. The tender at Smith's Basin weirs at 3:30 p. m. found the water one inch over the spillway, and he opened one gate. At 3:40 the water was six inches over the spillway, and he opened the second gate. He then attempted to raise the other two gates, but was unable to do so, and they were not raised that day. The tender for the Empey weirs was not at his post, and he did not arrive there until after the shower was over, and the water was flowing over claimant's field. The gates were then raised.

It is reasonably clear that the water overflowed the canal bank opposite claimant's field because the canal bank at that point had been left lower than the general level of such banks (Shannahan v. State of New York, 57 App. Div. 239, 68 N. Y. Supp. 131), and because of the failure of the waste-weir tenders at Empey weirs and Smith's Basin to properly attend to their duties; the one in not being at his post and opening the gates when they should have been opened, and the other in failing to repair or have the two defective gates repaired after there had been sufficient time to repair or have them repaired. While it appears that the shower on July 24th was severe, it does not, from the fair weight of evidence, appear that it was unprecedented, or that a greater amount of water flowed into the canal at this time than on previous occasions. It does not appear that, at other times when rain had so fallen, the canal overflowed its banks; and the conclusion therefrom must necessarily be that the canal is built with sufficient provision for taking care of such a temporary deluge of water, and that the failure to keep the water from overflowing its banks in this case was the result of negligence on the part of the employés of the state. The four gates at Empey weirs would discharge 32,520 cubic feet of water per second, and 1,951,200 cubic feet per hour. If, therefore, these gates had been opened at 3 o'clock, they would, prior to the time when the overflow complained of occurred, have discharged an amount of water equal to 6 inches in depth over the entire length and width of the Twelve-Mile Level. The two gates at Smith Basin, if opened, would have discharged a further amount of one-half as much water. Such gates would first discharge the water from the canal near the openings, and then draw the water from points north and south of the openings; and, in our judgment, it would very materially have decreased the amount of water in the canal opposite claimant's field. We think the counsel for the state is mistaken in his claim that, if the gates had all been opened during the time that the water remained above its normal level

in the canal, the claimant's damage would not have been prevented.

The judgment is against the weight of evidence, and it should be reversed on the law and facts, and a new trial granted, with costs of appeal to appellant. All concur.