JACOB MENDELSON and Others, Copartners, Doing Business as MENDELSON BROS. & SIFF, Appellants, *v.* THE STATE OF NEW YORK, Respondent.

Fourth Department, November 9, 1926.

Waters and watercourses — action to recover damages caused by diversion of flood waters in construction of Barge canal — prior to construction of canal, flood waters passed through well-defined channels on flat lands near claimants' property — State filled said channels and provided new channels for flood waters and thereby created nuisance — flood in question was extraordinary but not unprecedented — State should have anticipated flood of size of one in question — break in mill race and breaking of dam not primary cause — when property is injured as direct result of diversion of flood waters by obstruction of flood channel, liability exists against those diverting water — State is liable same as individual — damage must be limited by notice of claim.

In an action to recover damages caused by flood waters escaping from the Barge canal near Lyons, N. Y., and washing away claimants' building, it appears that prior to the construction of the Barge canal the flood waters of a creek

flowed over flat lands near claimants' building and flowed through well-defined channels in the flats, and, after flowing through well-defined channels within the flats, returned to the regular channel of the river to which it was tributary; that the State used the flats as a spoil bank, filled up all the natural flood channels and left a new flood channel close to claimants' building. The State created a nuisance and is liable to the claimants for the damage done, notwithstanding the flood in question was extraordinary though not unprecedented, since any one who obstructs the natural flood channels of a stream or diverts the flood waters from their natural channels, is liable for the consequences resulting therefrom. Furthermore, the State should have anticipated a flood of the size of the one in question, since the records show that floods of that size or of nearly that size have recurred at almost regular intervals for many years.

The contention by the State that a break in a mill race and the breaking of a dam on the Canandaigua outlet, which entered the Clyde river, was the cause of the damage, is not sustained, since it appears that the claimants' building was destroyed without concurrence of waters from the mill race or dam. In view of these circumstances, the burden was cast upon the State to make clear proof that there were other primary or concurrent sources of causation of loss, for which it was not responsible.

The liability of the State for the damage done is no different from the liability of an individual or corporation in similar circumstances.

Although the amount of damages has been found at $38,000, the claimants cannot recover in excess of $25,000, the amount specified in their notice of claim.

APPEAL by the claimants, Jacob Mendelson and others, from a judgment of the Court of Claims in favor of the defendant, entered in the office of the clerk of said court on the 31st day of March, 1926, dismissing the claim of the claimants upon the merits.

*Joseph Sapinsky* [*Arthur E. Sutherland* and *Alvin T. Sapinsley* of counsel], for the appellants.

*Albert Ottinger, Attorney-General* [*Joseph B. Mulholland, Deputy Attorney-General*, of counsel], for the respondent.

DAVIS, J. In constructing the Barge canal through the village of Lyons prior to 1915, the State canalized the Clyde river. In the necessary work incident thereto it excavated a large amount of material which it deposited on lands adjacent to the river, known as the " Hotchkiss Flats." This " spoil bank," as it is called, covered nearly eight acres to a depth of from nine to twelve feet. More than one-half of the land thus occupied belonged to the State, the remainder it leased.

Canandaigua outlet (hereinafter called the " Outlet ") is a stream about twenty miles long flowing northerly from Canandaigua lake into the Clyde river. Its course as it approaches the canalized river is somewhat winding. About 1,000 feet south of the spoil bank it turns to the west and reaches the river at the west side of the bank. At different places along the Outlet are five dams for the production of water power. In the basin or

watershed traversed by this stream are several villages, including Shortsville about fifteen miles from Lyons.

A raceway twenty feet wide and twelve feet deep, owned by the Empire Electric Light and Gas Company, leads from the Outlet into a millpond at a point a short distance east of the spoil bank. There are gates in the northerly end of the millpond which open into the canal.

Claimants, who are copartners, were in 1922 occupants of a building known as the Sautter property located on the west side of Geneva street in Lyons. The rear of this building was about thirty feet east of the spoil bank. The base of its rear wall was nearly on a level with the flats. Claimants were there engaged in the manufacturing business and owned machinery and equipment, and had on hand some manufactured goods. Between the building and the bank a channel twenty to thirty feet wide had been left by the State for the passage of flood waters. Otherwise the flats were covered by this bank from the mouth of the Outlet east to the building.

On August 23, 24 and 25, 1922, there was a heavy rainfall causing such a flood that the channel was unable to carry off the waters, the wall of the building in question was undermined and fell, and property of the claimants was seriously damaged. This claim against the State has resulted and it is based on the theory that the State created a nuisance by the erection of this spoil bank, and is consequently liable.

The facts are not greatly in dispute although there is a wide difference between the parties as to the inferences and conclusions to be drawn therefrom. Floods have been common and at least of yearly occurrence in this locality, varying in their intensity and volume. The flats were covered at such times. This flood may be characterized as unusual and perhaps extraordinary, but not unprecedented. In the seven years that had elapsed since the spoil bank was erected there had been no flood which the channel provided did not readily carry off. Prior to the existence of the bank there had been several floods greater than any occurring during this seven-year period. This flood was characterized by three witnesses for the State as the greatest that had occurred within many years; one placed it at fifty years, another at forty-seven, the other twenty-two. It was probably a matter of opinion induced in part, no doubt, by the damage caused. The Littlefield dam near Shortsville gave way and added its waters to the flood. As commonly happened, the channel of the Outlet was unable to carry the waters off during this rainfall, and they broke over the banks, covering the low lands adjacent to the spoil bank and

finding their outlet in part through the channel at the east of the bank. These flood waters were turned east by the bank, and as the strong current swept east toward the channel, a part rushed through the channel with great volume and velocity into the river, while other portions were held back by the inadequacy of the opening and broke through the embankment of the raceway, and some of the water therein contained was added to the flood.

It seems to be well established by the evidence that prior to the time of the improvement of the river these recurrent floods flowed over the Hotchkiss flats and made well-defined courses varying in depth to a maximum of ten feet through the lands now occupied by the spoil bank. Through these channels the flood waters reached the river but a short distance from the natural outlet of the stream. These lands were not cultivated and those channels remained undisturbed until they were obliterated by being filled with excavated material. This action on the part of the State, it is claimed, caused a diversion of these flood waters from their natural course. The outlet provided at the east, it is said, was neither sufficient nor well located as good engineering would suggest, and constituted the proximate cause of the damage sustained. Furthermore, it is claimed that the State should have anticipated a flood such as this, for the reason that in preceding years there had been those of a similar character.

This rainfall as registered at Shortsville was five and eight one-hundredths inches. During the past thirty-two years it appears by official records that in four different years there were rainfalls in the month of August exceeding in volume the one in question, and eight others which have approximated it, ranging from four and three-tenths inches to five inches. Lyons is in a locality where the rainfall is the heaviest in the State. Floods, as we have said, were common and recurrent, varying in volume from year to year, but invariably causing an inundation of the flat lands so that often people could go about there in boats. These overflows would result in further erosion of the flood channels as the waters returned to the river. Nine years before a flood had covered the flats to a depth of seven or eight feet. On one prior occasion a dam on the Outlet gave way. Such, in brief, is the history of floods in that locality, which could have readily been ascertained by those undertaking the work of creating the spoil bank.

Assuming then that this flood was of an unusual and even extraordinary character, though it had been preceded by others of a similar nature, it becomes a question of fact as to whether the State could reasonably have anticipated such consequences as followed when the former flood outlets were filled and the course

of the flood waters diverted. And even if that question is found in favor of claimants, the question of legal liability remains to be answered. These questions the learned court below found against the claimants. We take a different view and disagree with the conclusions there reached. We think the State might reasonably have anticipated the condition that arose and made provision for the security of adjacent property through better engineering. It would seem to be elementary knowledge that waters theretofore permitted to take a wide sweep over waste lands into which they had worn channels, should not be diverted far to the east into a narrow channel in close proximity to a building. The narrow limits of the new channel were certain to increase the velocity and force of the waters.

It might be well to dispose of two somewhat troublesome preliminary questions before proceeding to discuss principles of legal liability. The State claims that the contribution of two independent elements furnished the proximate cause of the damage: (1) The break in the dam at Littlefield; and (2) the breaking of the bank of the raceway. Both it is said added to the volume of the flood and these causes cannot be separated from any neglect of the State, nor was the State bound to anticipate such consequences in providing an outlet for flood waters. These arguments were regarded as potent by the learned court below. We do not attach great importance to them.

It is quite evident from the amount of rainfall and from a description of the flow of waters soon thereafter that the water escaping from the stream was sufficient in volume to have caused the damage. As to the raceway, it was the flood itself rushing to the east away from its natural outlet that caused the break in the bank. How much water there was in the raceway (whose gates had remained closed) as compared with the flood waters does not appear. It would not seem that the placid waters in the raceway could have contributed greatly to the flood. At least they would have remained quiescent except for the action of the flood waters just described. Water was already running through the wall of the building at six o'clock on the afternoon of the twenty-fourth, and the bank of the raceway did not break until eight-thirty or nine. It does not clearly appear at just what time the dam at Littlefield broke or how soon thereafter the waters thereby released would have reached Lyons. As nearly as can be determined the break occurred about midnight of the twenty-fourth. This dam was about eighteen miles away. The building collapsed about midnight. It does not sufficiently appear that either of the causes mentioned were potential in contributing to the result. In view

of the circumstances, we think the burden was cast upon the State to make clear proof that there were other primary or concurrent sources of causation of loss, for which it was not responsible.

We turn to the question of liability for the diversion of water from flood channels. There is conflict of authority on this subject in other jurisdictions. It is said that in this State the law in that respect is still unsettled. (*Howard* v. *City of Buffalo*, 211 N. Y. 241, 259.) In this Department, as well as in the Third Department, the question has been considered and the rule of liability determined. We adhere to that rule, not only as a matter of precedent, but through belief in its principle. We have here no question of flood waters leaving a stream, spreading and settling over the surface of the land, severed from the main current never to return, but waters leaving the main channel, maintaining their integrity through a broad but well-defined course, returning again and uniting with the waters from which they were separated. (*O'Connell* v. *East Tennessee, V. & G. R. Co.*, 87 Ga. 246; *Cairo, V. & C. R. Co.* v. *Brevoort*, 62 Fed. 129.) When property is injured as a direct result of the diversion of flood waters of this nature by placing some obstruction in their ordinary channel, liability for the damage follows, even though the flood was extraordinary though not unprecedented. (*Mundy* v. *N. Y., L. E. & W. R. R. Co.*, 75 Hun, 479; *Van Duzer* v. *Elmira, C. & N. R. R. Co.*, Id. 487; affd., on opinion of court below, 152 N. Y. 634; *Higgins* v. *N. Y., L. E. & W. R. R. Co.*, 78 Hun, 567; *Wilson* v. *Penn. R. R. Co.*, 129 App. Div. 821.)

The liability of the State when the damage arises because of its ownership and control of the canals, is not different from that of an individual or corporation. (Canal Law, § 47, as amd. by Laws of 1915, chap. 494; *Sipple* v. *State*, 99 N. Y. 284, 288.) Such liability for damage under conditions similar to those involved here has been fixed and established in adjudicated cases. (*Shannahan* v. *State of New York*, 57 App. Div. 239; *Greeley* v. *State of New York*, 94 id. 605; *New England Brick Co.* v. *State of New York*, 151 id. 274.)

We hold, therefore, that it was well established that the State created a nuisance by the construction of this spoil bank in the well-defined courses of the flood waters, and by failing to provide a sufficient outlet at a suitable location to carry off such flood waters, even when the volume thereof was in a sense extraordinary. The diversion of such waters from their natural channel was the proximate cause of the damage which the claimants sustained, and the State thereupon became liable.

The amount of damages has been found at $38,000. But the amount claimed in the notice filed, which has not been amended,

was $25 000, so that sum must limit the amount of recovery. Certain findings of fact and conclusions of law are disapproved and reversed and new findings will be made. These will be enumerated in the order.

The judgment should be reversed on the law and the facts and judgment directed on the findings in favor of the claimants for $25,000 damages, with costs.

HUBBS, P. J., SEARS, CROUCH and TAYLOR, JJ., concur.

Judgment reversed on the law and facts and judgment directed for the claimants for $25,000 damages with interest from the date of filing the claim, with costs to appellants. Certain findings of fact and conclusions of law disapproved and reversed and new findings made.