J. ERNEST DALY and Another, Appellants, *v.* THE STATE OF NEW YORK, Respondent.*

(Claim No. 18162.)

Third Department, May 15, 1929.

* Revg. 132 Misc. 92.

*Rogers & Sawyer* [*John E. Sawyer* of counsel], for the appellants.

*Hamilton Ward, Attorney-General* [*John L. Campbell, Deputy Assistant Attorney-General*, of counsel], for the respondent.

HASBROUCK, J.   Between Dunham's and Smith's Basins along the Champlain canal, Haskin's brook enters the prism of the canal from the west.   Prior to the building of the canal Haskin's brook flowed at some point into Wood creek.   The canal in the neighborhood of claimants' leasehold was built 100 years ago and during all that length of time no channel of that brook has been used or known to have existed easterly of the canal.

In 1848, about six hundred feet to the east of the canal where the brook enters it, the roadway of the Delaware and Hudson railroad leading from Albany to Montreal was constructed at an elevation of five feet above the natural level of the land.   Across the canal prism during its operation were two bridges.   One, the Green bridge, just north of Haskin's brook, and the Company bridge some quarter of a mile to the south.

The Barge canal was constructed about twenty years ago between the railroad and Wood creek and constitutes a bar against any waters from the Champlain canal at or near the location of claimants' lands finding Wood creek by flowing easterly except at Minton's spillway.

After the building of the Barge canal the State did away with the Green and Company bridges and filled the prism of the canal for crossings at such points, leaving small culverts through which

the water might pass. The claimants were lessees of lands lying upwards of 1,100 feet south of Haskin's brook and lying adjacent to and east of the Champlain canal. That would place the northerly end of Daly's farm slightly north of the Company's bridge. Wood creek lays 2,100 feet to the east of the Champlain canal. The easterly border of the lands in suit rested upon lands slightly lower and described in the testimony as a swamp.

At the northeast corner of claimants' lands there is a culvert under the railroad of four and one-half by four and one-half feet in dimension. Farther south there is a smaller one, two by two and one-half feet. Claimants' land at a slight grade declines toward the railroad. In the spring the banks of the canal have overflowed since the bridges have been taken away and the fills have been placed in it. The weather in the vicinity had been wet beyond ordinary in June and the forepart of July, 1925, but claimants' land had not been submerged. It had been planted to potatoes and corn. From six P. M., July twenty-first, to two P. M., July twenty-second, there came a rainfall of one and seventy-seven one-hundredths inches. The water in the prism of the canal south of the company's crossing rose so that it overflowed the canal bank to the north and south of that crossing to the depth of a foot and moved north into the section of the prism between the two crossings. The water in the prism north of Green's bridge was lower by two or three feet than the easterly bank of the canal. It is patent that if the culvert under the highway across the canal at that point had been adequate to carry the water northerly to Minton's spillway no water would have escaped from the canal between the two crossings. In fact the water never overflowed the banks before the bridges were taken down and fills substituted. The water along the canal, however, did escape and flowed both north and south of the company's crossing directly on claimants' lands, and from points northerly of that crossing where it escaped it flowed directly upon or across other ownerships on claimants' land until it reached a depth of three or four feet. There was so much water thrown on claimants' land that it strongly saturated the ground and stood in the furrows for seven or eight days and injured the vines and destroyed the young potatoes. No proceedings have been taken by the State to abandon the Champlain canal.

The claim for damages is based upon an allegation of negligence in the maintenance of the unused canal and particularly upon not providing culverts large enough to allow accumulations of storm water to move northerly in the prism so as to discharge at Minton's spillway.

The Court of Claims has found that the rainfall of one and seventy-

seven one-hundredths inches from six P. M. of July twenty-first to two P. M. of July twenty-second was extraordinary. Such fact does not in itself constitute a defense to the claim. The exercise of ordinary care requires precaution as well against the extraordinary as against the ordinary. It is only the unforseeable in the exercise of ordinary care, or the act of God, that exculpates the negligent wrongdoer. (*Crowley* v. *State*, 99 App. Div. 52; 112 id. 872.)

The decision in the case at bar by the court below did not, however, turn upon the amount of rainfall. It is based upon the law as laid down by the Court of Appeals in *Stone* v. *State* (138 N. Y. 124). The argument in that case is found in the following language: " Another error in the award arises out of the assumption that the damages sustained by the claimants resulted, as a legal conclusion, from the fact of the overflow and the omission of the State to maintain the guard bank in repair. Assuming for the present that a duty rested upon the State to maintain the guard bank, and that as originally constructed it would have retained the water within the new channel, the omission of this duty *created a claim only in favor of such owners of lands overflowed, who were injured in consequence of the action of the State in changing the channel, and who except for this act would not have sustained a similar injury.* It was shown that the guard bank was broken through at the point where it crossed the original natural channel of the river and that through this opening the water followed the original channel till it came to an embankment originally constructed across its course for the Genesee Valley canal, and now used by the Genesee Valley railroad, which embankment formed a dam, detaining the water for a time, but which was also carried away, and the water then continued to flow through the original channel, but overflowing its banks, until it reached the lands of the claimants. There is no evidence that the lands of the plaintiffs were overflowed to any greater extent than they would have been if the new channel had never been made. * * * It is not suggested in the evidence that the damming of the water by the railroad embankment, and its subsequent discharge after the embankment was broken through, increased the overflow on the claimants' land beyond what would have occurred if no embankment had been there. * * * "

There seems to be an important distinction between the *Stone* case and that at bar. In the *Stone* case there was the old bed of the Genesee river and there was the overflow of that river and the escape of the water from the river bed directly upon the claimants' lands.

In the case at bar no witness was able to locate the bed of Haskin's brook east of the canal nor give its width nor the height of its banks nor its carrying capacity up to overflow.

There is no evidence that the water ever got into the bed of the brook and flowed from such bed upon the claimants' land. The proof is that it flowed directly from the prism of the canal on the land of claimants' neighbor or upon claimants' land and stood there at a depth of three or four feet. In the *Stone* case the court was dealing with exactitudes. In this case the Court of Claims has rendered judgment against the claimant on surmises and speculations.

It remains a speculation as to where Haskin's brook ran east of the canal; it remains a speculation what its capacity within its banks was east of the canal; it remains a speculation as to whether it would have reached the plaintiffs' land at all if it would have overflowed its banks; it remains a speculation as to what depth, if it had escaped, it would have attained at plaintiffs' land and how long it would have tarried in its search for Minton's spillway for it could not have found Wood creek without jumping over the Barge canal.

But beyond these considerations there is the law that running water was parcel of the freehold east of the canal. (*Johnson* v. *Jordan*, 2 Metc. [Mass.] 234, 239; *Scriver* v. *Smith*, 100 N. Y. 471, 480; Angell Water Courses, § 90.)

Upon the assumption that in acquiring the water the public officials, Canal Commissioners, took a fee, under section 3 of chapter 262 of the Laws of 1817, passed April 15, 1817, and that claimants had no right to the return of the waters of Haskin's brook, the State had no more right to cast the water it owned on claimants' land that it would have had to cast thereon the dredgings from the canal prism.

The judgment should be reversed on the law and facts, and judgment directed for the claimants in the sum of $850, with costs.

Van Kirk, P. J., Hinman, Davis and Whitmyer, JJ., concur.

Judgment reversed on the law and facts, with costs, and judgment directed for the claimants in the sum of $850.

Findings of fact numbered 9, 10, 11, 12, 15, 18, and the latter part of finding numbered 13, from the word " canal " and beginning " but the same was not sufficient to raise its level to an overflow," are reversed; and all of the conclusions of law are disapproved. The court finds the claimants' requests to find numbered 4, 5, 6, 7, 9, 10 and 11. The court finds the amount of the damages to be $850, as expressed in the opinion of the court below.