MARY L. GIBSON, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 27862.)

Court of Claims, September 6, 1946.

*J. Theodore Cross* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Frank M. Noonan* of counsel), for defendant.

LAMBIASE, J.   On September 14, 1944, claimant was, and since the year 1940 had been, the owner of a parcel of land with a dwelling house located thereon, situate on the southerly side of the highway running from the village of Clinton, New York, on the east to Hamilton College on the west, both located in the county of Oneida, New York, which highway then was, and now is known as the Clinton-College Hill highway, by which name we

shall refer to it hereinafter. Claimant's property lies west of the village of Clinton, New York, and just east of the intersection of said Clinton-College Hill highway and another highway known as the Deansboro-Kirkland highway, the latter highway running in a general northerly and southerly direction. We shall hereinafter refer to the intersection of these two highways as the " intersection " without designating by name the highways constituting it. The State of New York had constructed these two afore-mentioned highways some years previous to 1944. About the year 1932, that part of the Clinton-College Hill highway lying west of the westerly line of the afore-mentioned intersection had been turned over by the State to the County of Oneida, New York, as part of said county's highway system, and at the time hereinafter mentioned the same was under the jurisdiction and control of the County of Oneida, New York, and was part of its highway system.

On September 14, 1944, surface waters flowed from the said Clinton-College Hill highway and from said afore-mentioned intersection onto claimant's land above mentioned to a depth sufficient to surmount a board barrier extending six inches above the level of the lawn in front of the cellar windows and accumulated in the cellar of claimant's house to a depth of three feet. Damage was by reason thereof sustained by claimant to her real estate, to its appurtenances, and to some of her personal effects and furniture contained in her said house.

Claimant's claim herein against the State has been brought to recover for the damage alleged to have been thus sustained by her, and it is predicated upon allegations of negligence and of nuisance in connection with the construction and maintenance by the State of the storm-water sewerage and drainage facilities provided by the State for claimant's premises and for other premises in the vicinity of claimant's property and in the area adjoining said intersection. The State contends that the drainage and sewerage system had been built in accordance with accepted engineering standards; that its capacity was sufficient for the locality; that it was properly maintained, and that in any event, the damage suffered by claimant was occasioned by surface waters suddenly and unexpectedly augmented to flood proportions by a rain storm of such unusual severity, and of such unprecedented and extraordinary character, as to be deemed an act of God which could not be reasonably anticipated or provided against in the exercise of ordinary diligence.

The record discloses that the following physical conditions relative to the subject matter of our inquiry obtained at and in

the vicinity of claimant's property on September 14, 1944: The Clinton-College Hill highway was paved with concrete and consisted of two lanes as it came down from Hamilton College on the west and continued easterly past claimant's property. Down its center, there was a sanitary sewer and in connection therewith there was a manhole located approximately in the center of the afore-mentioned intersection. It seems that this sanitary sewer and manhole were not under the jurisdiction of the defendant and were not a part of its sewerage and drainage system at this point. On the south side of said highway, just beyond the paved portion thereof, there was a storm water sewer consisting of a fifteen-inch vitrified pipe. This pipe, as shown on claimant's Exhibit 4 and within the area set forth thereon, extended from the summit of College Hill, proceeded in an easterly direction and emptied into a catch basin covered by a two-foot-square iron grating, located just west of the northwesterly corner of the afore-mentioned intersection (point " D " of claimant's Exhibit 4). Across the same highway on the north side thereof, just west of the southwesterly corner of said intersection, there was another such catch basin with a similar grating (claimant's Exhibit 4). While these two catch basins were on that part of said highway which was under the control, jurisdiction, and maintenance of the County of Oneida, New York, it appeared that the State had constructed them and that it inspected and maintained them as part of its storm-water sewerage and drainage system at this point.

From said catch basin "D" aforesaid on the south side of said Clinton-College Hill highway, there ran a storm-water sewer constructed by the State, and consisting of a twenty-four-inch pipe. This pipe traversed underground the afore-mentioned intersection on the south side thereof by means of a concrete culvert, and emptied into a structure forty-five inches wide and thirty-six inches high, located just east of the southeasterly corner of said intersection (point " C " of claimant's Exhibit 4). At said point "C" there was a juncture of said storm-water sewer with another conduit carrying a stream course coming from the south of said afore-mentioned intersection and running along the east side of said Deansboro-Kirkland highway. This stream course, before making said juncture aforesaid, flowed easterly down the hill west of said intersection, through partially wooded terrain, parallel to, and at some distance south of the Clinton-College Hill highway. It crossed the said Deansboro-Kirkland highway underground by means of a culvert going from the west side to the east side thereof, where it emerged

into an open ditch. It then turned northerly and flowed as an open stream course for a short distance and entered an old storm-box-covered structure or conduit through which it continued onto point " C ", reference to which has hereinbefore been made. This conduit or storm-box structure varied in width and height and had been constructed by the owner of the land in front of which it had been built. After their juncture at point "C" aforesaid, the afore-mentioned storm sewer and said stream course flowed into an open ditch extending from point "C" easterly to point "B" (claimant's Exhibit 4), at which latter point there was a headwall and a catch basin which had been constructed by the State. From said point "E" there was a storm-water sewer consisting of a twenty-four-inch pipe, which extended to the east, traversed underground claimant's driveway which was just east of point "B" aforesaid, and continued, as shown on claimant's Exhibit 4 and within its limits, to point "A" thereon. At or near point "A" aforesaid, said sewer then crossed underground the said Clinton-College Hill highway going from the south to the north side thereof by means of a culvert and then continued along in an open ditch through terrain beyond the area in which we are concerned.

There was a raised curb seven or eight inches in height which extended all the way down both sides of that part of said Clinton-College Hill highway which was west of the aforesaid intersection; and there was a curb about the same height at the southeasterly corner of the afore-mentioned intersection just west of point "C" aforesaid. The easterly end of this curb at this latter point, was ten or twelve feet west of the westerly end of the open ditch referred to hereinbefore as extending between points "B" and "C" aforesaid. Its obvious purpose at the intersection was to prevent surface waters coming down the hill, west of the intersection, from running off the intersection and onto the lands to the south and east thereof.

On the north side of said Clinton-College Hill highway in the vicinity of claimant's property, and at said intersection, there was on the day of the overflow, a storm sewer consisting of an eighteen-inch tile pipe. This pipe commenced at a point on the north side of said highway just north of the paved portion thereof, and just west of the westerly line of the afore-mentioned intersection and continued easterly to the intersection. It continued underground through said intersection as a twenty-four-inch pipe, went through a culvert two feet square and one hundred feet long and emerged on the easterly side of said intersection into an open ditch. There was no accurate

measurement of this open ditch, although there was some testimony to the effect that it was probably one and one-half feet deep and a couple of feet wide.

Commencing at the west side of the afore-mentioned intersection there was steep rising ground which continued westerly about up to the campus of Hamilton College. This steep rising ground was described as having the following ascending grades for the following distances: 10% for about 500 feet; 12% for 800 feet; 7½% for about 500 feet; 9% for 300 feet; 10.6% for 500 feet; and 8.6% for 200 feet in the sequential order named. From this last-mentioned point the grade flattened out to a 1% ascending grade for a distance of about 1,000 feet at which point one arrived at the campus of Hamilton College. The banks on either side of the Clinton-College Hill highway west of said intersection were steep, attaining a height of ten to fifteen feet from the level of the highway. There were houses on both sides of this hill with private driveways coming out onto the hill.

Commencing at the southeasterly side of the afore-mentioned intersection and proceeding easterly therefrom on the said Clinton-College Hill highway there was a descending grade of 3.1% for 400 feet which thereafter progressively scaled down to a .8% descending grade at or near the point on said highway where the storm water sewer on the south side of said highway crossed the same to the north side thereof to outlet into the ditch beyond point "A" (claimant's Exhibit 4). Claimant's house is at an elevation which is lower than that of the surface of the highway on which it abuts. Such was the case when the highway was constructed and, of course, such was the case in 1940 when claimant purchased the premises. The elevation of the land at the southerly edge of the pavement was given as 194 feet. From that point going southerly, the land dips forming a little gutter, the southerly side of which said gutter is about an inch and a half below the pavement level and then, from that point the elevation of the land goes down to an elevation of 193 feet at the house. There is thus a difference of one foot in elevation between the level of the pavement and of the ground where the house stands.

On September 14, 1944, afore-mentioned, the rain had started to fall at about 2:30 or 3:00 P.M., the evidence on this point, however, not being too clear. It rained hard for about one hour and then it slackened some. The rain continued to fall, however, until about 6:00 P.M. The rainfall was severe and is described in the evidence as "torrential". The rainstorm is variously described in the evidence as a "terrible storm", "an unusual

storm ", " a worse storm than ordinary ", " an extraordinary storm ", and a so-called " flash storm or a cloud burst type of a storm ". There was a regular stream of surface water about three inches deep coming down the Clinton-College Hill highway west of the afore-mentioned intersection, some of which accumulated at the bottom of the hill and on the intersection, went over the top of the curb at the southeast corner of the intersection and onto the lands to the south and east therefrom; and the rest of which, after being deflected back onto the highway proper, flowed easterly along the highway. Some of this eventually flowed onto the land of the claimant. There was sand, gravel, and debris which came down the hill on to the intersection and on down the highway with this surface water, all of which was moving pretty fast. This gravel, sand and debris, the latter consisting of sticks and leaves, accumulated on the gratings of the afore-mentioned catch basins, clogging and obstructing them. The wind was blowing; and a tree or a part thereof had been felled by the force of the storm and lay across the road near claimant's property blocking traffic.

The foregoing we believe is established by the record and shows the physical conditions existing and obtaining on the day of the overflow in the area, at, in and about claimant's property which area is shown generally on claimant's Exhibit 4 aforementioned. Let us now consider the contentions of the claimant and the position of the defendant with reference thereto. What duty or responsibility did the State owe to the claimant under the circumstances indicated herein?

The fact that claimant has sustained damages does not in and of itself entitle her to recover against the State. To entitle claimant to recover under her claim as filed, claimant must show, not only that the defendant was negligent but also that such negligence was the proximate cause of the overflow. (*Annino* v. *City of Utica,* 276 N. Y. 192; *Bird* v. *St. Paul F. & M. Ins. Co.,* 224 N. Y. 47.) To succeed upon the theory of nuisance she must establish the essential and necessary elements constituting the same. Legal or proximate cause is always dependent upon the facts of a particular case and for this reason the words are beyond definition or conclusive explanation. Very often it is confused with the preliminary question whether there is any negligence at all. (*O'Neill* v. *City of Port Jervis,* 253 N. Y. 423.)

There was no duty on the part of the State to provide drainage for claimant's premises or those of other adjoining owners; and no action lies at the instance of an individual for damages based upon a failure to act. (*Ebbets* v. *City of New York,* 111

App. Div. 364; *Wilson* v. *Mayor of New York*, 1 Denio 595; *Mills* v. *City of Brooklyn*, 32 N. Y. 489; *Lynch* v. *Mayor*, 76 N. Y. 60.) This nonliability for omission to supply drainage or sewerage does not obtain where the necessity for the drainage or outlet is caused by the act of the corporation. (*Byrnes* v. *City of Cohoes*, 67 N. Y. 204, 207. See, also, *Seifert* v. *City of Brooklyn*, 101 N. Y. 136, 143.) When the municipal corporation determines upon a plan of sewerage and puts such plan into effect, then the municipality becomes liable for damages resulting from negligence either in construction or in care and maintenance thereof. (*Mayor of City of New York* v. *Furze*, 3 Hill 612; *Barton* v. *City of Syracuse*, 36 N. Y. 54; *McCarthy* v. *City of Syracuse*, 46 N. Y. 194; *Smith* v. *Mayor*, 66 N. Y. 295; *Crage* v. *City of Buffalo*, 273 N. Y. 517; *Prime* v. *City of Yonkers*, 192 N. Y. 105, 110.) The law is firmly established that in constructing sewers, and in keeping them in repair, a municipal corporation acts ministerially, and, having authority to do the act, is bound to the exercise of needful prudence, watchfulness and care. The authorities in support of these principles are too numerous and familiar to require particular comment. (*Barton* v. *City of Syracuse*, 36 N. Y. 54, *supra*.)

The evidence adduced upon the trial failed to establish any of the essential facts required for recovery against the State and particularly upon the grounds alleged in claimant's claim. Let us consider these particular grounds. First as to the construction of the sewerage and drainage facilities: It appeared that they were built according to accepted engineering standards and that they were adequate to drain and carry off the surface waters which were the result of ordinary and normal rainfalls, and also of such storms which could reasonably be anticipated, with the exception hereinafter noted, in the area which the said storm sewers were designed to drain.

Claimant's evidence with reference to the capacity of the storm sewers and particularly as to their inadequacy to drain the area in question is, in certain of its essential elements, not of a very convincing quality. The record on this point indicates the following: That the fifteen-inch storm-water sewer as it came down the Clinton-College Hill highway west of the aforementioned intersection at a 10% grade had a capacity of 9,000 gallons of water per minute; that the capacity of the twenty-four-inch storm sewer pipe under the intersection on the south side thereof at the particular established grade up to point "C" (claimant's Exhibit 4) was about 28,000 gallons of water per minute; that at point "B" (claimant's Exhibit 4), the twenty-

four-inch pipe had an approximate capacity of 23,000 gallons per minute and that at a point several hundred feet east of claimant's property on the south side of the highway and at or near the point where the storm sewer crossed the said Clinton-College Hill highway from the south side thereof to the north side thereof at a descending grade of .8%, the capacity of said sewer is given as 9,000 gallons per minute.

The capacity of the natural water course coming in from the south into the structure at point "C" (claimant's Exhibit 4) is given as being 15,000 to 20,000 gallons " free flowing, " without being under pressure. We are not impressed with this testimony as the claimant's witness, Mr. Shaw, who gave it, stated that in his opinion it was not possible, merely from a knowledge of the area of this natural water course, to estimate its capacity to take water because that depended on some knowledge of the side walls and of the bottom thereof, which information and knowledge the witness admitted he did not have. In fact, he himself stated that to give an estimate as to the capacity of this natural water course would be " very much of a guess ". His testimony as to the inadequacy of the storm water sewers admittedly was based upon no detailed computations as to the area, square mileage or nature of the terrain which comprised the watershed served by this sewerage and drainage system. He gave what he characterized as his " engineering opinion " on both the two last-mentioned points. His " engineering opinion ", the witness stated was based upon his experience and that only. We feel that this type of testimony leaves too much to be desired by way of accuracy and depends too much upon speculation and surmise. A question of negligence cannot be left to guess, speculation and surmise. (*Lahr* v. *Tirrill,* 274 N. Y. 112.)

We can find no evidence in the case as to the amount in inches of rain which fell on the day of the overflow or on the occasion of any previous, similar or comparable rainstorm. We are thus left without the benefit of exact information on this important point. While claimant adduced some proof as to the capacity of the storm sewers and while claimant's proof as to their inadequacy is based upon the assumption that said storm sewers were flowing full to capacity at the time of the overflow, we have been unable to find anything in the evidence which satisfactorily indicates that said storm sewers were indeed carrying their capacity load at the time of the overflow. True it is, that there is some proof that the cover on the structure at point "C" (claimant's Exhibit 4) was off but the cause of its being off,

again, was left to conjecture. There is a grave doubt, in our opinion, under the circumstances of this case as to whether said sewers were flowing to capacity. This is accentuated by the fact that the evidence indicates that the gratings covering the catch basins afore-mentioned were temporarily clogged and obstructed during the storm by an accumulation of debris, gravel and sticks which was brought down upon them by the flow of surface waters, augmented by the storm, coming down the pavement of the Clinton-College Hill highway west of the afore-mentioned intersection. The pavement of said highway, because of the topography of the terrain surrounding it, and particularly because of the steep banks on both sides thereof at this point, constituted a veritable runway for the runoff of these debris-laden surface storm waters. The evidence indicates that the overflow was caused by this temporary clogging and obstructing of the gratings covering the catch basins rather than by any inadequacy in the size or design of the storm sewer pipes themselves.

The clogging to some degree of gratings on catch basins by water-borne debris is undoubtedly a frequent occurrence in terrain such as we have been discussing, and the removal of the gratings affords no solution to the problem. Good construction practice requires that some method be used to exclude materials that might get into and block the underground pipes, and to protect the general users of the highway against the hazards of an unguarded opening. (*Fuller* v. *State*, 46 N. Y. S. 2d 762.)

A municipality is not liable for an increase in flow of surface waters resulting solely from pavement of streets or other improvements and cannot be required to limit the amount of surface water discharged into a stream to the natural flow of said stream before such improvement. (*Fox* v. *City of New Rochelle*, 240 N. Y. 109.) If, however, the city collects surface waters into a single channel and casts it in a large and substantially increased volume on an adjacent owner so that the stream will be filled beyond its natural capacity and thereby causes the stream to overflow and flood his lands, the owner has a cause of action. A municipality has no immunity from legal responsibility for creating or maintaining nuisances. (*Noonan* v. *City of Albany*, 79 N. Y. 470; *Foster* v. *Webster*, 44 N. Y. S. 2d 153, 158.)

It has been held that when without the creation of a defined water course or the alteration of an existing one the result is so to change the natural contour of the land as to cause surface waters to collect in a highway and overflow a neighbor's prop-

erty, the act is no less lawful. It seems that since this water is not cast by drains or ditches upon adjoining premises, defendants may get rid of it any way they can. They have full dominion over their own land, above as well as below surface. The resulting damage gives no right of action. *Damnum absque injuria.* (*Bennett* v. *Cupina,* 253 N. Y. 436, citing, *Goodale* v. *Tuttle,* 29 N. Y. 459, 467; *Barkley* v. *Wilcox,* 86 N. Y. 140, 147 and *Howard* v. *City of Buffalo,* 211 N. Y. 241, 258. See, also, *Bull* v. *State of New York,* 231 App. Div. 313, and for a review of pertinent cases see *Mennito* v. *Town of Wayland,* 56 N. Y. S. 2d 654.)

In the instant case we can find no diverting or obstructing by the State of the runoff of surface waters from the watershed from the course of its natural flow, no collecting of the same in an artificial channel, and conducting of it to a given point with no adequate or proper outlet, and no discharging of the same in great volume upon the lands of another. (*Byrnes* v. *City of Cohoes,* 67 N. Y. 204, *supra; Seifert* v. *City of Brooklyn,* 101 N. Y. 136, *supra.*) We do not believe that the act of the State in putting the sewer pipes in the ditches, and then covering up said pipes by filling up the ditches, in and of itself, constituted an act of actionable negligence on the part of the State. We hold, therefore, that upon the record claimant has failed to establish that the storm sewerage and drainage system on the day of the overflow was improperly or negligently constructed and was inadequate.

As to maintenance, care and inspection: There is evidence of regular inspection and of maintenance by the State of the sewerage and drainage system, and particularly of such inspection and maintenance within a reasonable time of the day of the overflow. The record indicates that at, or about, the time of the overflow the sewers in, about, and under the intersection were clear of debris and obstruction and that water was flowing freely through the pipes. The clogging and obstructing of the gratings hereinbefore referred to appeared to have occurred only on the occasions of these severe and unusual storms. On the occasion complained of, though ineffectual to prevent claimant's damage, the accumulation of debris on the gratings were removed therefrom within a reasonable time after the storm subsided. It does not appear that any reasonable inspection such as could be exacted by the most rigid laws imposed upon a municipality in charge could have revealed the obstructions on the gratings in time to have avoided and averted the overflow. (*Beyer* v. *City of New York,* 141 App. Div. 679.) We find

therefore no negligence on the part of the defendant in the care and maintenance of the sewerage and drainage facilities in question.

In view of what we have hereinbefore held, it follows that claimant has failed to establish the creation and maintenance of a nuisance by the State with reference to said drainage and sewerage facilities aforesaid, and we so find and hold.

We have hereinbefore referred in detail to the rainstorm which occurred on the day of the overflow. We are unable to agree with the State that said rainstorm was of such unusual, extraordinary and unprecedented severity and character that it could not reasonably have been anticipated or provided against in the exercise of ordinary care and diligence; and that in fact said rainstorm was such as to be deemed an act of God. Assuming that the rain storm complained of herein was unusual, severe and even extraordinary, it appears that it had been preceded in previous years by others of a similar nature. There is evidence that there had been at least one such storm sufficient in volume, intensity and severity as to cause an overflow of surface waters in the vicinity of said intersection with consequent flooding of claimant's property, each year for several years previous to the one of September 14, 1944. Claimant herself testified that the rain storm complained of was the third of its character that she had experienced since her purchase of the property in 1940. Under these circumstances we hold that the rain storm of September 14, 1944, though severe, unusual and extraordinary was not unprecedented and was not an act of God. In *Daly* v. *State of New York* (226 App. Div. 154, 157) the Appellate Division in the Third Department said: " * * * The exercise of ordinary care requires precaution as well against the extraordinary as against the ordinary. It is only the unforseeable in the exercise of ordinary care, or the act of God, that exculpates the negligent wrongdoer. (*Crowley* v. *State*, 99 App. Div. 52; 112 id. 872.) "

We are satisfied from the evidence that the State was or should have been aware in the exercise of ordinary care of the occurrence and recurrence of these storms. (*Dekowski* v. *County of Montgomery*, 263 App. Div. 697.)

This conclusion on our part, favorable as it is to the claimant, does not answer the question of legal liability and is not enough in our opinion to hold the defendant liable and responsible under the circumstance herein.

It must be borne in mind that the claimant's premises are located at or near the base of a steep hill, that the flow of water

is downward, and that in a state of nature the claimant's lands must take the surface water that flows from the land above. The evidence shows that water which had collected upon the surfaces of the Clinton-College Hill highway and of the Deansboro-Kirkland highway, flowed down these highways to their intersection. It further appears, as already noted herein, that at the intersection of these two highways there were sewers of sufficient capacity to receive and convey away all the surface water collecting at that place except on the occasions of the storms hereinbefore alluded to, when gravel, sand, sticks and other debris washed down these highways borne by surface waters on the pavements thereof and temporarily clogged or closed the grating on the catch basins of the sewers. There is nothing in this accumulation of water that differs from that which results from the construction of all streets and roadbeds; and it does not appear that the claimant's premises were subjected to a further burden in reference thereto than they were required to when they were in a natural state. (*Watson* v. *City of Kingston,* 114 N. Y. 88, 92.)

Claimant has suffered damage through the unfortunate occurrence described in her claim and detailed in the evidence. We are satisfied, however, that she has failed to maintain the burden of proof required to establish that the State is responsible for her damages.

Defendant's motion for dismissal of the claim herein made at the end of claimant's case and upon which decision was reserved is denied with an exception thereon to the defendant. Defendant's motion for a dismissal of claimant's claim made at the conclusion of the entire case is granted with an exception thereon to the claimant.